`

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | Case No. 1:21-cr-191 (RCL) |
| v. | : | |
| | : | |
| **DEVIN STEINER,** | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Devin Steiner to 30 days incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

**I.   Introduction**

Defendant Devin Steiner, a 41 year-old delivery person from Wooster, Ohio, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that interrupted Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Defendant Steiner pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Steiner (1) boasted

---

[1] Although the Statement of Offense in this matter reflects a sum of more than $1.4 million for repairs (ECF No. 31 at ¶ 6), as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

`

that he "was storming the Capitol building" and then breached the Senate Wing door within six minutes of the initial Capitol breach; (2) observed that rioters had smashed the windows of the Capitol when he entered the building, and nevertheless paraded through the Capitol with the mob, chanting and overrunning police lines; (3) remained in the Capitol for nearly 30 minutes, refusing to leave even after he heard from fellow rioters that a rioter had been shot; and (4) after January 6, deleted evidence of his participation in the riot, and encouraged others to do so, without having expressed any remorse for his conduct to date.

The Court must also consider that Steiner's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent mob that relied on numbers to overwhelm police officers, breach the Capitol Building, and disrupt the proceedings. The facts of and circumstances of Steiner's crime support a sentence of incarceration in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 32 (Statement of Offense), at 1-7.

*Defendant Steiner's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Steiner told an associate that he would not be able to work on January 6 because he planned to go to DC. Steiner asked the associate to "pray for safety", and the associate urged him to "be safe"[2]:

---

[2] These texts messages were obtained from Steiner's phone, which the government seized pursuant to a search and seizure warrant. The government produced the text messages to Steiner and his codefendant, Adam Miller, in discovery.



Steiner and his brother-in-law and co-defendant, Adam Miller, then traveled by car from Ohio to Washington, D.C. on the morning of January 6, 2021 to protest Congress' certification of the Electoral College.  Statement of Offense ¶ 8.  Steiner and Miller attended the "Stop the Steal" rally and then marched with other protestors to the Capitol.  *Id.* ¶ 9.

At approximately 1:46 p.m., Steiner sent a text message to a friend, stating "Storming the capitol building with hundreds of thousands!"  Steiner and Miller approached the Capitol from the West front, the scene of some of the most intense violence and conflict on the Capitol Grounds on January 6.  At approximately 2:13 p.m., rioters on the Upper West Terrace smashed a window next to the Senate Wing Door using a riot shield.  This led to the first breach of the U.S. Capitol by a rioter who jumped through the window over the broken glass:

3

`



*Image 1 (screenshot from Exhibit A)*

Approximately six minutes after the entry depicted above, Steiner and Miller entered the U.S. Capitol through the Senate Wing Door, as shown in Image 2, below (Steiner, wearing a red "Trump" beanie hat, is circled in red; Miller, wearing a cowboy hat, is circled in yellow).[3]

*Image 2 (screenshot from Exhibit A)*

---

[3] A nine-minute, twelve-second clip from this surveillance camera, which shows both the initial breach at 1:58 and Steiner and Miller's entry at 8:02, has been submitted directly to the Court and defense counsel via USAfx as Exhibit A.

4

`

Broken glass from the smashed windows on both sides of the Senate Wing Door lay on the ground. Miller looked at Steiner and pointed his left hand in the direction of the shattered glass while Steiner and Miller advanced into the Capitol with the mob, as shown in Image 3, below. (Miller's hand pointing at the glass on the floor is circled in yellow; Steiner circled in red; the shattered glass circled in blue.)



Image 3 (screenshot from Exhibit A)

Steiner and Miller then moved to the Crypt and joined a cohort of rioters there who were facing off with Capitol Police officers while chanting "Who's House? Our House," as those officers tried to hold a police line, as shown in Image 4, below (Steiner and Miller circled in red and yellow, respectively).[4]

---

[4] *See* Exhibit B, submitted directly to the Court and defense counsel via USAfx.



*Image 4 (screenshot from Exhibit B)*

Surveillance footage shows that at this time a thin line of police officers was trying to hold off a much larger mob, including Steiner and Miller. Rioters overran that police line. Steiner and Miller then traveled further into the Capitol and through various locations, including a second-floor hallway outside room H227. There, at approximately 2:33 p.m., a rioter knocked to the floor Congressional materials directly in front of Steiner, who was filming the scene on his cell phone, as shown in Image 5, below (Steiner circled in red, Miller circled in yellow, rioter knocking materials off a desk circled in blue).



*Image 5*

`

At approximately 2:48 p.m., Steiner and Miller—after nearly thirty minutes of parading through the Capitol during an ongoing riot, surrounded by rioters ransacking property and overrunning police lines—exited the Capitol at the Upper House door.  As captured by a publicly available video, rioters in the area had recently learned that another of the rioters inside the building had been shot by Capitol Police.[5]  Steiner and Miller immediately turned back and re-entered the building, as shown in Images 6 and 7 below.

 

Image 6                                                                          Image 7

Steiner and Miller remained inside the building illegally until approximately 2:53 p.m., when police officers, including MPD reinforcements, were able to direct a large group of rioters out through the House Door.  Within approximately two minutes of Steiner and Miller exiting, rioters in this group began to push, punch, and fight the outnumbered MPD officers who were trying to lead them out of the building—highlighting the peril faced by the police officers inside the Capitol throughout the extensive time that Steiner and Miller joined the mob and paraded

---

[5]     The publicly available video is available here: https://www.youtube.com/watch?v=DHessyWYXqM .  The portion referred to above begins at 26:01.

`

through the building. [6] Steiner has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so. Statement of Offense at ¶ 13.

Three days later, Steiner confirmed that he was worried that he would be held accountable for his illegal actions on January 6:



Four days after that, Steiner—who, as shown above, frequently carried his cell phone during the Capitol Riot and appeared to be filming videos with it—replied as follows to an associate who asked him about his experience on January 6:



Based on the surrounding circumstances, the government believes that "Delete that vid" reflects an instruction from Steiner to his associate to delete a video that Steiner had sent him from the

---

[6] *See* Exhibit C, submitted directly to the Court and defense counsel via USAfx. Steiner and Miller exit at the 9:02 mark of the video. Violent confrontations between rioters and MPD officers begin at the 11:04 mark.

`

Capitol Riot. When the FBI subsequently seized Steiner's phone on April 8, 2021, it did not contain any pictures or videos from inside the Capitol Building on January 6, 2021.

*The Charges and Plea Agreement*

On May 19, 2022, the United States charged Steiner (together with Miller) by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). On May 26, 2022, Steiner voluntarily surrendered to law enforcement officials. On May 27, 2022, the United States charged Steiner by a four-count Information with the same four crimes. On December 7, 2022, pursuant to a plea agreement, Steiner pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.  Statutory Penalties

Steiner now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

9

`

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Steiner's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Steiner, the absence of violent or destructive acts is not a mitigating factor. Had Steiner engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Steiner's case is that he breached the Senate Wing Door within six minutes of the initial breach.  Anyone in Steiner's position, among the first wave of rioters to enter the building from the west front, would had to have seen significant violence, smelled tear gas, and heard a blaring alarm and exploding flash bangs on their way from the west front up to the Senate Wing Door.  Further, surveillance video specifically shows that Steiner saw that the windows surrounding the Senate Wing Door had been smashed in the riot.  Steiner nevertheless chose to participate in this mob and press forward.  Further, once inside the building,

`

he joined rioters chanting in the Crypt and then overrunning a makeshift police line there. He also observed a rioter ransacking property and, again, continued moving forward with the mob.

A second key factor in Steiner's case is the length of time that he remained inside the building, even re-entering a second time. Steiner's own text messages show that he knew he was not allowed inside the Capitol Building: he boasted that he was "storming" the Capitol. Yet Steiner remained inside the building for more than 30 minutes, adding to the difficulties of the greatly outnumbered police officers desperately trying to protect the building and—more importantly—trying to protect the Members of Congress and staff inside it.

A third key factor in Steiner's case is his conduct after January 6. Steiner deleted evidence from his phone and instructed others to do so as well. At the same time, he did not, and still has not, expressed any remorse for contributing to a dangerous riot.[7]

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Steiner

As set forth in the PSR, Devin Steiner does not have any criminal history. ECF 36 ¶¶ 24-28. Steiner reported to the PSR writer that has been employed as a delivery person for a pizza business since 2017 and he also has been self-employed in an unspecified manner. *Id.* at ¶ 45. Steiner did not report any serious health or family issues. *Id.* at ¶¶ 30-42. Overall, Steiner's history and characteristics do not present any significant mitigating or aggravating factors here.

---

[7] The Government notes that Steiner did self-surrender without incident when he was informed, through counsel, of the arrest warrant, and Steiner did not act irresponsibly when the FBI executed a search warrant at his residence. These factors are not significantly mitigating because, had Steiner done otherwise, he could be facing additional criminal charges.

11

`

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. The gravity of these offenses thus demands deterrence. It is important to convey to future potential rioters—

12

`

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Steiner's lack of remorse also suggests that specific deterrence cuts in favor of incarceration here as well. The defendant joined a violent mob, "storm[ed] the Capitol," and illegally remained inside the Capitol Building disrupting critical proceedings for more than 30 minutes while Members of Congress and the Vice President had to be evacuated for their safety. A sentence of incarceration will help drive home the point that Steiner cannot repeat his unlawful and dangerous conduct the next time he is unhappy with the results of an election.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Steiner based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Steiner has pleaded guilty to Count Four of the Superseding Information, charging him with Parading, Demonstrating and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a),

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

`

including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences (zero to six months). *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

`

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. John Lammons*, 22 Cr. 103 (RCL), the defendant, like Steiner, approached the Capitol through the chaos of the west front; breached the Capitol at the Senate Wing door within minutes of the initial breach; and boasted (by striking a victory pose, rather than by sending a text message) of his actions in illegally storming the Capitol. Lammons engaged in certain aggravating behavior that distinguishes him from Steiner to a degree, in that he urged rioters "to hold their ground" and he appeared to smoke an illegal substance inside the Capitol. Steiner, however, also engaged in aggravating behavior different from that of Lammons, in that he re-entered the Capitol during the riot. And whereas Lammons interviewed with the FBI and showed the agents videos he had recorded of his illegal actions on January 6, Steiner deleted all his videos and instructed others to do so as well. The government sought, and the court imposed, 30 days' incarceration and 36 months' probation for Lammons.

In *Unites States v. Jeremy Ryan Sorvisto* (1-21-CR-320)(ABJ), the defendant Sorvisto, like Steiner, traveled hundreds of miles to attend the rally in Washington, D.C. on January 6, 2021; illegally entered the Capitol and remained inside for an extensive period of time (25 minutes); and, after the event, instructed others to delete evidence of his participation in the riot, including photographs and the distinctive jacket he had worn. The government sought, and the court imposed, 30 days' incarceration for Sorvisto.

`

In *United States v. Suzanne Ianni* (1-21-CR-451)(CJN), the defendant Ianni's conduct during and after January 6 was similar in many respects to that of Steiner: she led rioters in chants while seeing rioters breaking doors and windows to gain access to the Capitol; she was part of a group that confronted and eventually overwhelmed police officers inside the Capitol, allowing the group to move further into the Capitol; and she did not express remorse for her actions on January 6. The Government recommended 30 days' incarceration and 36 months' probation, and the Court sentenced Ianni to 15 days' incarceration and 30 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).[9]

---

[9] Numerous judges of this District, including this Court, have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. *See, e.g.*, 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty

`

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days incarceration, 36 months' probation, 60 hours community service, and $500 restitution. Such a sentence would protect the community, promote respect for the law, and deter future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Jason M. Manning
Jason M. Manning
Trial Attorney, Detailee
NY Bar No. 4578068
jason.manning@usdoj.gov

---

misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

17

`

## CERTIFICATE OF SERVICE

On this 3rd day of March 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ Jason Manning
Trial Attorney, Detailee
NY Bar No. 4578068
jason.manning@usdoj.gov